THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                                Mailed:
September 20, 2012                                      September 5, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Sheetz of Delaware, Inc.*
*v.*
*Doctor's Associates Inc.*
_____

Opposition No. 91192657
_____

Roberta Jacobs-Meadway of Eckert Seamans Cherin & Mellott LLC for Sheetz of Delaware, Inc.

Walter B. Welsh of St. Onge Steward Johnston & Reens LLC for Doctor's Associates Inc.

_____

Before Rogers, Mermelstein and Bergsman, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Doctor's Associates Inc. ("applicant") filed a use-based application to register FOOTLONG, in standard character format, for "sandwiches," in Class 30.[1]

Sheetz of Delaware, Inc. ("opposer") opposed the registration of "Footlong" on the ground that when used in connection with sandwiches "Footlong" is generic and, in the alternative, that the term "Footlong" is at least merely descriptive and has

_____
[1] Serial No. 77324328, filed November 8, 2007.

not acquired distinctiveness.    Applicant, in its answer, denied the essential allegations in the notice of opposition.

Preliminary Issues

A.    Applicant's motion to amend the description of goods.

During the proceeding, applicant filed a motion to amend the description of goods in its application from "sandwiches" to "sandwiches, excluding hot dogs." Applicant argued that a hot dog is not a sandwich.[2]  Opposer objected to applicant's motion on the ground that excluding one type of sandwich (*i.e.,* hot dog sandwiches) from sandwiches *per se* in the description of goods does not make any difference "in determining whether the term 'footlong' is commonly understood and commonly used to identify sandwiches that are about a foot long irrespective of source."[3]

Although we find that a hot dog is a sandwich,[4] we grant applicant's motion to amend its description of goods.  Having excluded hot dogs from the identification,

---

[2] Applicant's Brief, p. 19.

[3] Opposer's opposition to applicant's motion to amend the goods.

[4] A "hot dog" is defined as "a sandwich consisting of a frankfurter in a split roll, usually eaten with mustard, sauerkraut, or relish."  **THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED)**, p. 925 (2d ed. 1987).  The Board may take judicial notice of dictionary definitions.  *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).  In addition, the record is replete with examples of hot dogs identified as sandwiches.  For example, see the following attached to the June 16, 2010 Metzger Declaration:

> Exhibit B – "No Matter How You Slice It Bred In England, But Meat For Americans," *The Roanoke Times* (March 15, 2002) – "Imagine baseball without the hot dog – which is just a sandwich with the bread on a hinge" and "But here in America, land of plenty, the sandwich is no one-trick pony. … We have burgers, hot dogs, submarines, clubs, po-boys, pita pockets, Reubens, BLTs."

> Exhibit G – "Everybody knows what they want at the Curly Dog," *The Indianapolis Star* August 19, 2003) – "The namesake sandwich, for the uninitiated, is a footlong hot dog …"

we confine our analysis to whether the term "footlong" is generic for any other types of sandwiches.

B.     Applicant's objections to opposer's evidence.

On July 28, 2011, the parties filed a "Substitute Stipulation to Proceed Under ACR." The parties agreed that (i) they could rely on the materials submitted in support of and against opposer's previously filed motion for summary judgment, (ii) testimony could be submitted by declaration, (iii) the parties need not make the pretrial disclosures otherwise required by 37 CFR § 2.121 and Fed. R. Civ. P. 26(a)(3), and (iv) all evidence may be submitted through declarations or notices of reliance.[5]

Applicant objected to the following testimony and evidence on the ground that opposer failed to disclose the witnesses and evidence during discovery:

1.     Declarations of Nelly Rodriguez, Salvatore Palilla, and Adam Mucci, restaurant owners to whom applicant sent cease and desist letters regarding their use of the term "footlong";

---

Exhibit K – menus from *inter alia* Porky's Drive In, Interstate Barbecue, Archie Moore's, etc.

[5] While we commend the parties for agreeing to efficiencies intended to facilitate the introduction of evidence at trial, ideally, "ACR" (*i.e.*, Accelerated Case Resolution) cases do not merely facilitate introduction of more evidence, but should also limit the amount of evidence placed before the Board. When parties place before the Board, for consideration at final hearing, the entire record developed in conjunction with a summary judgment motion (which we said then was "extensive") as well as significant trial evidence, the ease with which the parties can add evidence to the record does not aid swift review of the record and prompt decision-making. This is particularly true when the case involves numerous objections to evidence that need to be considered and resolved to determine the precise scope of the record on which the claims and defenses can be decided. A larger record is not necessarily a better record.

2. Declarations of Alexis Pontius-Jones and Timothy Johnson, restaurant owners who use the term "footlong";

3. October 11, 2011 Supplemental Declaration of Philip Johnson, opposer's expert witness, presenting a rebuttal survey;

4. Notices of reliance on printed publications and Internet postings purportedly using the term "footlong" generically to refer to sandwiches; and

5. The second and third supplemental declarations of John Metzger, a legal assistant employed by opposer's counsel, introducing *inter alia* evidence of third parties purportedly using the term "footlong" generically to refer to sandwiches.

Applicant's interrogatory Nos. 32 – 37 requested that opposer identify all testimony and documents on which opposer may rely to establish that the term "footlong" is used generically to identify 12-inch sandwiches. Opposer objected to the interrogatories on the ground that it is not required to identify witnesses it intends to call or documents it intends to disclose in advance of trial. In addition, without waiving its objection, opposer stated that it "may rely on any documents produced in response to earlier discovery requests and provided in support of [opposer's] motion for summary judgment, and documents which will be produced."[6]

Initial disclosures, discovery responses and pretrial disclosures should be viewed as a continuum of *inter partes* communication designed to avoid unfair surprise and to facilitate fair adjudication of the case on the merits. *Speir Wines*

---

[6] Opposer's responses to applicant's Interrogatory Nos. 32-37.

*(PTY) Ltd. v. Sheper,* 105 USPQ2d 1239, 1246 (TTAB 2012). As indicated above, however, the parties waived pretrial disclosures in this case.

To determine whether opposer's failure to disclose the witnesses in question in its initial disclosures, in supplemental initial disclosures, or in a supplemental response to applicant's interrogatories is substantially justified or harmless, the Board is guided by the following five-factor test:

1) the surprise to the party against whom the evidence would be offered;

2) the ability of that party to cure the surprise;

3) the extent to which allowing the testimony would disrupt the trial;

4) importance of the evidence; and

5) the non-disclosing party's explanation for its failure to disclose the evidence.

*See Great Seats, Inc. v. Great Seats, Ltd.*, 100 USPQ2d 1323, 1327 (TTAB 2011). The Board has also stated that, unless seasonably remedied, a party's failure to identify a witness in its *initial* disclosures deprives the adverse party of the opportunity to seek discovery of the identified witness, and this fact "must [be] consider[ed] … as one of the relevant circumstances … in determining whether to strike [the witness's] testimony deposition." *Jules Jurgensen/Rhapsody, Inc. v. Baumberger,* 91 USPQ2d 1443, 1444-45 (TTAB 2009).[7]

---

[7] In a case where, as here, the parties stipulated to forego pretrial disclosures, the better practice would have been for opposer to have supplemented its discovery responses to include the identification of its third-party witnesses and other documents on which it intended to rely prior to submitting the testimony declarations and notices of reliance, although its failure to do so does not, as explained herein, necessarily require striking the evidence in question. Had the parties not stipulated to forego pretrial disclosures, they

Rodriguez, Palilla and Mucci Declarations

With respect to Nelly Rodriguez, Salvatore Palilla, and Adam Mucci, restaurant owners to whom applicant sent protest letters regarding their use of the term "footlong," applicant had knowledge of the existence of these people and their businesses, as well as the operative facts stated in their declarations because they were people to whom applicant sent cease-and-desist letters regarding their use of the term "Footlong." Thus, we find that applicant had adequate and reasonable notice about these witnesses and opposer's failure to supplement its discovery responses or initial disclosures does not preclude the introduction of their testimony declarations. Applicant's objection to the testimony declarations of Nelly Rodriguez, Salvatore Palilla, and Adam Mucci is overruled.[8]

---

would generally have been required, in their pretrial disclosures, to name the witnesses they expected to testify, or who could testify if needed, by oral testimony or, as provided for in this case, by declaration, and would have been required to provide general identifying information about the witness(es). *See* 37 CFR § 2.121(e). However, a party is not required to supplement or correct its initial disclosures to provide identifying information about a witness listed in pretrial disclosures if that information previously has been made known to the other party in writing or during the discovery process. *See Galaxy Metal Gear Inc. v. Direct Access Technology Inc.,* 91 USPQ2d 1859, 1861 (TTAB 2009) (opposer's failure to supplement its initial disclosures to identify foreign nonparty witness as a potential witness does not preclude introduction of witness' discovery deposition at trial, even though opposer should have supplemented initial disclosures, because applicant was aware of witness's identity and subject matter of her testimony and was able to cross-examine the witness during the discovery phase). *See* TBMP § 408.03 (3d ed. rev. 2 2013).

[8] Applicant also objects to the declarations of these witnesses, as well as those of Alexis Pontius-Jones and Timothy Johnson discussed *infra,* on the ground that "the declarants had a direct interest in the outcome of the Opposition because each of the declarants purportedly uses the FOOTLONG mark in their business" and that the declarants are biased in favor of opposer. (Applicant's Brief, p. 38). Applicant's objection is overruled. These declarants are fact witnesses and fact witnesses are not expected to always be disinterested. Applicant has offered no reason for us to believe that their testimony is not truthful. The Board has taken the entire testimony of the witnesses into account in assessing the probative value of their testimony.

Pontius-Jones and Johnson Declarations

On the other hand, applicant had no knowledge about the identity and businesses of Alexis Pontius-Jones and Timothy Johnson, two other restaurant owners who use the term "footlong" but were not among the recipients of cease-and-desist letters from applicant. Fed. R. Civ. P. 37(c)(1) provides that a party that fails to provide information or the identity of witnesses through initial disclosures or discovery may, upon motion or objection by its adversary, be precluded from using that information or witness at trial, "unless the failure was substantially justified or is harmless."

Applying the *Great Seats* factors to these witnesses, the record shows that opposer filed a motion for summary judgment in which it relied on substantial evidence of third-party use of the term "footlong" in the manner of a generic term to refer to 12-inch sandwiches. In addition, the record shows that applicant sent numerous letters to restaurant owners objecting to their use of the term "footlong" to refer to their 12-inch sandwiches, thus, introducing into the record evidence of third-party use of the term "footlong" to refer to a particular sized sandwich. Under these circumstances, applicant is hard-pressed to argue convincingly that it was surprised that opposer attempted to introduce the declaration of two additional restaurateurs who identify 12-inch sandwiches using the term "footlong." Thus, there is no real surprise for applicant to cure. In addition, because the proffered

7

testimony will not disrupt the trial and because it is cumulative, it will not unduly prejudice applicant.

Opposer asserts that it did not supplement its initial disclosures or earlier discovery responses because "[b]y stipulation, there was no requirement for pretrial disclosures, and no limit on supplementation of evidence" and, therefore, it "had the right and obligation to enter into the trial record all available evidence demonstrating the relevant public's perception of the term 'footlong' in connection with sandwiches that are about a foot long."[9] We disagree with opposer's interpretation of its duty to supplement its discovery responses. Nonetheless, we find opposer's failure to supplement its initial disclosures or discovery responses to identify Alexis Pontius-Jones and Timothy Johnson, restaurant owners who use the term "footlong," is harmless and, therefore, applicant's objection is overruled.

<u>Metzger Second and Third Supplemental Declarations</u>

Although opposer identified John Metzger in its initial disclosures, applicant objected to the second and third supplemental declarations, filed October 12, 2011 and January 31, 2012. John Metzger is a legal assistant at Eckert Seamans Cherin & Mellott, LLC, opposer's counsel, who authenticated third-party use on the Internet of the term "footlong" used generically as to sandwiches of a particular size. The initial disclosures describe John Metzger as follows:

> John Metzger is a litigation paralegal at the law firm of Eckert Seamans Cherin Mellott. He has knowledge concerning third party use of the term footlong to describe

---

[9] Opposer's Reply Brief, p. 21.

and identify sandwiches which are approximately a foot long.

According to applicant, the Board should exclude the above-noted declarations because they included documents that opposer did not produce in discovery.[10]

Once again, we apply *the Great Seats* test. We find that Mr. Metzger was identified in the initial disclosures, that applicant should not have been surprised by cumulative Internet evidence of third-party use of the term "footlong" to refer to 12-inch sandwiches and that the introduction of these declarations did not disrupt trial. Moreover, the evidence that Mr. Metzger introduced was publicly available and was of a type of which applicant was aware as evidenced by applicant's numerous letters objecting to various third-party uses of the term "footlong." In view of the foregoing, we find opposer's failure to supplement its discovery responses to specifically identify the documents attached to John Metzger's supplemental testimony declarations is harmless and, therefore, applicant's objection is overruled.

Applicant also objected to the Metzger supplemental declarations on the ground that Mr. Metzger "made substantive decisions regarding which documents to include."[11] This objection is overruled because witness decision-making is inherent in deciding which third-party uses to include. In any event, the Board reviews the evidence of third-party use for what it shows on its face, not by how it was obtained.

---

[10] Applicant's Brief, p 36.

[11] Applicant's Brief, p. 36.

9

Finally, applicant objects to the Metzger supplemental declarations because Mr. Metzger is biased because he is an employee of opposer's counsel.[12] The Board is aware that many witnesses have a particular point of view with respect to a dispute. For example, any witness a party calls generally provides testimony favorable for that party and prejudicial to the defending party. Applicant has presented no evidence demonstrating that Mr. Metzger's testimony will be untruthful or unduly prejudicial and his declarations make his allegiances clear. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice.").

Applicant's objections to the second and third supplemental declarations of Mr. Metzger are overruled.[13]

Philip Johnson October 11, 2011 Declaration

Applicant objected to the October 11, 2011, Supplemental Declaration of Philip Johnson, the Chief Executive Officer of Leo J. Shapiro & Associates, L.L.C., a market research firm that designs and conducts surveys measuring consumer behavior and opinion.

In response to applicant's interrogatory No. 18, opposer stated, as of June 11, 2010, "no survey or market research has been conducted by or for Opposer to date."

---

[12] Applicant's Brief, p. 37.

[13] With respect to the Internet evidence, since 2010, the Board has permitted Internet evidence to be introduced through a notice of reliance so long as the printout from the website displays the URL and the date it was printed. *See Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1039 (TTAB 2010). As a result, Mr. Metzger's declaration was unnecessary for the admission of the attached evidence, which could have been submitted under a notice of reliance.

In response to applicant's interrogatory No. 19, opposer objected to applicant's interrogatory requesting the identity of any experts retained by opposer as being premature.

On September 14, 2010, opposer submitted a report entitled "An Analysis of the [Dr. Sandra] Cogan Survey" listing Philip Johnson as the author, in support of opposer's motion for summary judgment. Applicant deposed Mr. Johnson on April 5, 2011. Mr. Johnson testified that opposer had not asked him "to design or supervise a survey in this matter." [14]

During its testimony period, opposer introduced into evidence the October 11, 2011, supplemental declaration of Philip Johnson. Having been given the underlying questionnaires and coding of applicant's Cogan Survey after issuing his initial evaluation, Mr. Johnson supplemented his critique based on the additional data. In addition, the supplemental declaration of Philip Johnson includes the results of a survey designed and conducted by Mr. Johnson to rebut applicant's Cogan Survey. On November 29, 2011, applicant again deposed Mr. Johnson and specifically questioned him about the rebuttal survey. In addition, applicant introduced the December 9, 2011 declaration of Dr. Sandra Cogan critiquing Mr. Johnson's rebuttal survey.

---

[14] Johnson Dep., pp. 22-23 (April 5, 2011). *See also* Johnson Dep., pp. 17 and 20-21 (retained only to evaluate the design, methodology and results of the Cogan Survey). Mr. Johnson stated in a subsequent report that in June 2011, opposer asked him to conduct a survey to accurately measure whether the term "Footlong" is generic. A Rebuttal of the Cogan Survey, p. 2 (Johnson Declaration (October 11, 2011), Exhibit A).

Opposer should have supplemented its responses to applicant's interrogatory Nos. 18 and 19 to state that it was retaining Mr. Johnson as an expert to design and conduct a genericness survey. However, any surprise to applicant by opposer's failure to give applicant technical notice of Mr. Johnson's rebuttal survey was ameliorated by applicant having more than one month to prepare for Mr. Johnson's deposition. Moreover, applicant submitted the declaration of Dr. Cogan critiquing Mr. Johnson's survey.

Further, Johnson's survey is proper rebuttal to the extent that it bears on the validity and probative value of the Cogan survey. Thus, we have considered the Johnson rebuttal survey to that extent. We have not considered the Johnson survey for purposes of supporting opposer's case-in-chief on its claim that "Footlong" is generic. *See Helene Curtis Industries Inc. v. Suave Shoe Corp.*, 13 USPQ2d 1618, 1625 n. 33 (TTAB 1989) ("Thus, we have considered plaintiff's rebuttal testimony and survey to that extent. While it is a fine line to draw, we have not considered the survey for the purpose of supporting plaintiff's case-in-chief….").

In view of the foregoing, we find that opposer's failure to supplement its discovery responses to inform applicant that Mr. Johnson was going to conduct a genericness survey was harmless. Applicant's objection to the October 11, 2011 Johnson declaration introducing his genericness survey is overruled. However, to be clear, we are considering the survey and declaration, only to the extent they constitute rebuttal; we are not considering the survey and declaration to establish that the term "footlong" is generic.

Notices of reliance on printed publications and Internet postings

Regarding applicant's objection to opposer's notices of reliance on printed publications and Internet postings showing third-party uses of "footlong" to refer to 12-inch sandwiches, it is clear that the objected-to documents were obtained or created by opposer in anticipation of its testimony period and were not responsive documents that were already within its possession or control when opposer was responding to document requests. A party need not investigate third-party use to respond to discovery requests. *Rocket Trademarks Pty Ltd. v. Phard S.p.A.,* 98 USPQ2d 1066, 1071 (TTAB 2011); *Sports Authority Michigan Inc. v. PC Authority Inc.*, 63 USPQ2d 1782, 1788 (TTAB 2001) (no obligation to search for third-party uses). Applicant's objection, in essence, is that it was somehow prejudiced by not having the documents produced earlier in response to its discovery requests. However, applicant was not put at a disadvantage. Again, opposer had no duty to conduct an investigation of third-party use during discovery and, certainly, opposer's attempt to present evidence of third-party use of the term "Footlong" should not have come as a surprise because it is common practice to introduce third-party use to demonstrate that a term is generic or descriptive.[15] Moreover, the documents introduced as exhibits to the Metzger supplemental declarations were equally accessible to applicant (*i.e.*, they were publicly available via the internet).

---

[15] As indicated above, under the Board's current rules, each party is required to make pretrial disclosures that name the witnesses it expects will testify and a general summary or list of subjects on which the witness is expected to testify, and a general summary or list of the types of documents and things which may be introduced as exhibits during the testimony of the witness. Trademark Rule 2.121(e).

Finally, applicant had thirty days between the close of opposer's testimony period and the opening of its testimony period to prepare any rebuttal against the evidence of third-party use. Accordingly, applicant's objection to the second and third Metzger declarations on the basis that the documents were not previously produced in response to applicant's discovery requests is overruled.

The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), applicant's application file.  As indicated above, the parties stipulated that they could rely on the materials submitted in support of and against opposer's previously filed motion for summary judgment and that all evidence may be submitted through declarations or notices of reliance.  Accordingly, the parties stipulated that evidence that normally is not admissible through a notice of reliance could be introduced through a notice of reliance.

The parties submitted the evidence listed below.

A.    Opposer's testimony and evidence.

1.    Declaration of Erwin D. Mulder, owner of 10 A&W Restaurants, 12 Long John Silver Restaurants, and 2 Taco Bell Restaurants, with attached exhibits;

2.    Declaration of Tammy Dunkley, opposer's Corporate Advertising Manager, with attached exhibits;

3.    Declaration of John Metzger, a legal assistant employed by opposer's counsel, with attached exhibits;

4.      Declaration of Sean McConnell, one of the attorneys representing opposer, authenticating and introducing Philip Johnson's report entitled "An Analysis of the Cogan Survey" (September 2010);

5.      Supplemental Declaration of John Metzger with attached exhibits;

6.      Opposer's notice of reliance on applicant's responses to opposer's interrogatories and requests for admission;

7.      Declaration of Nelly Rodriguez, owner of Spuds & Suds sandwich shop;

8.      Declaration of Salvatore Palilla, owner of Santoro's Submarine Sandwiches sandwich shop;

9.      Declaration of Timothy Johnson, owner of Eddie's Footlong Hot Dogs;

10.     Supplemental Declaration of Philip Johnson, Chief Executive Officer of Leo J. Shapiro & Associates, L.L.C., a market research firm in the field of consumer behavior and opinion, introducing his report entitled "A Rebuttal of the Cogan Survey";

11.     Notices of reliance on printed publications purportedly showing the use of the term "Footlong" in reference to sandwiches;

12.     Notice of reliance on the following items:

    a.      Wikipedia entry for sandwiches;

    b.      Representative advertising by applicant;

    c.      A news article posted online;

    d.      Representative protest letters from applicant;

    e.      Applicant's trademark standards program;

      f.      Applicant's franchisee brand standards guide; and

      g.      "Internal electronic mail correspondence";

13.     Second supplemental declaration of John Metzger with attached exhibits;

14.     Deposition of Philip Johnson (April 5, 2011) with attached exhibits;[16]

15.     Declaration of Alexi Pontius-Jones, Vice President of Lakeshore Foods Corporation, a company that operates supermarkets with deli counters that sell sandwiches;

16.     Notice of reliance on printed publications purportedly showing applicant's efforts to police the term "Footlong";

17.     Third supplemental declaration of John Metzger with attached exhibits;

18.     Deposition of Philip Johnson (November 29, 2011) with attached exhibits;[17]

19.     Notice of reliance on opposer's answer in a civil action between the parties and a copy of the Philip Johnson declaration submitted in that case; and

20     Declaration of Adam Mucci, owner of Mucci's Italian Market, a restaurant and sandwich shop.

---

[16] Applicant also submitted this as its seventh notice of reliance.

[17] Applicant had previously filed this deposition during its testimony period.

B.     <u>Applicant's testimony and evidence</u>.[18]

    1.     Declaration of Alaine Doolan, one of the attorneys representing applicant, introducing the following items:[19]

    a.     a survey report entitled "Genericness and Secondary Meaning Survey Regarding the Name 'Footlong'" by Dr. Sandra Cogan.[20]

    b.     the results of Internet searches for the term "footlong" in connection with sandwiches and hot dogs;

    c.     dictionary definitions;

    d.     opposer's advertising;

    e.     opposer's responses to applicant's written discovery; and

    f.     third-party menus;

    2.     Notice of reliance on the following items:

    a.     opposer's initial disclosures;

    b.     applicant's first set of request for admissions; and

    c.     opposer's responses to applicant's written discovery;

    3.     Notice of reliance on the following items:

    a.     applicant's correspondence to third parties regarding the use of the term "Footlong"; and

    b.     copies of oppositions and a civil action filed by third parties

---

[18] As its thirteenth notice of reliance, applicant filed a copy of its application file which was already of record pursuant to the rules.

[19] Applicant also submitted this as its fifth notice of reliance.

[20] This was also filed as applicant's first notice of reliance.

against applicant's registration for FOOTLONG and dispositions thereof;

4. Notice of reliance on opposer's letter of protest filed in applicant's application;

5. Deposition of John Metzger with attached exhibits;

6. Notice of reliance on the deposition of Tammy Dunkley with attached exhibits;

7. Deposition of Erwin D. Mulder with attached exhibits;

8. Deposition of Philip Johnson (November 29, 2011) with attached exhibits;[21]

9. Notice of reliance on the following items;

    a. complaint in a civil action between the parties;

    b. the transcript of a preliminary injunction hearing;

    c. declaration of Robert Wilker, Worldwide Profit Manager for opposer; and

    d. the previously submitted declaration by Tammy Dunkley;

10. Notice of reliance on the declaration of Valerie Pochron, corporate attorney for Franchise World Headquarters, a company related to applicant, with attached exhibits; and

11. Notice of reliance on representative samples of its use of the term "Footlong.'"

---

[21] Opposer also submitted this deposition transcript.

Standing

"The facts regarding standing … are part of [an opposer's] case and must be affirmatively proved. Accordingly, [opposer] is not entitled to standing solely because of the allegations in its petition." *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). To prove its standing to oppose the registration of an allegedly generic term, a plaintiff need only show it is engaged in the manufacture or sale of the same or related goods as those listed in the applicant's application; that is, that plaintiff has the right to use the term in a descriptive or generic manner. *Nature's Way v. Nature's Herbs*, 9 USPQ2d 2077, 2080 (TTAB 1989); *Ferro Corp. v. SCM Corp.*, 219 USPQ 346, 352 (TTAB 1983). *See also Binney & Smith Inc. v. Magic Marker Industries, Inc.*, 222 USPQ 1003, 1010 (TTAB 1984). Inasmuch as opposer sells submarine sandwiches, opposer has established its standing.[22]

Genericness

There is a two-part test used to determine whether a designation is generic: (1) what is the genus of goods at issue? and (2) does the relevant public understand the designation primarily to refer to that genus of goods? *H. Marvin Ginn Corp. v. Int'l Assn. of Fire Chiefs, Inc.*, 782 F.2d 987, 990, 228 USPQ 528, 530 (Fed. Cir. 1986). The public's perception is the primary consideration in determining whether a term is generic. *Loglan Inst. Inc. v. Logical Language Group Inc.*, 902 F.2d 1038, 22 USPQ2d 1531, 1533 (Fed. Cir. 1992). Evidence of the public's understanding of a

---

[22] Dunkley Declaration ¶6; Doolan Declaration, Exhibit M.

term may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers and other publications. *Loglan Inst.* 22 USPQ2d at 1533; *Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 202 USPQ 100, 105 (CCPA 1979).

A.      The genus of goods at issue.

The broad general category of goods involved here are sandwiches; specifically, sandwiches excluding hot dogs. *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1552 (Fed. Cir. 1991) ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration.").

B.      The relevant public.

The second part of the genericness test is whether the relevant public understands the designation primarily to refer to that class of goods. The relevant public for a genericness determination is the purchasing or consuming public for the identified goods. *Magic Wand Inc. v. RDB Inc.,* 19 USPQ2d at 1553. Because there are no restrictions or limitations to the channels of trade or classes of consumers for sandwiches, the relevant consuming public comprises ordinary consumers who purchase and eat sandwiches.

C.    <u>Public perception</u>.

    1.    <u>Dictionary Definitions</u>.

The term "footlong" is an adjective defined as "being about one foot in length: *a footlong hot dog*."[23]

    2.    <u>Applicant's use of the term "Footlong."</u>

        a.    <u>Application file</u>.

The specimen initially submitted with the subject application was identified as "a restaurant cling for use in stores" and is shown below.



If the above-noted specimen shows trademark use of "Footlong," then it must also show trademark use of **6" Sub** and **Wrap**. As used in the specimen, all three terms are displayed in the same manner (font, size, color, position), and used in the same way (*i.e.,* to identify a type of sandwich).

---

[23] *Yahoo! Education* (yahoo.com/reference/dictionary) (Metzger Declaration, Exhibit E). *See also wordnik.com* and *thefreedictionary.com* both derived from the **AMERICAN HERITAGE DICTIONARY**, *wiktionary.org, dictionary.reference.com* derived from the **RANDOM HOUSE DICTIONARY** (2010) (Metzger Declaration, Exhibit E).

In its September 3, 2008 response to an Office action, applicant submitted the substitute specimen shown below.



In its April 9, 2009 response to an office action, applicant submitted the Declaration of Valerie Pochron, "an Attorney of Applicant," in support of its claim of acquired distinctiveness including the advertising shown below.










b.    Applicant's notice of reliance.

During this proceeding, applicant introduced the following further examples of its use of the term "Footlong" through a notice of reliance.






The foregoing exemplars demonstrate that applicant is not using the term "Footlong" in a manner likely to be recognized as a trademark. For example, in the specimen of use set forth in subsection (a) *supra,* applicant does not differentiate the use of "6"-Sub, Wrap or Footlong. In the sandwich wrapping paper above, applicant uses the term "Foot Long" generically in the phrase "Giant Foot Long Sandwiches." The same is true of applicant's other depicted uses of "Footlong" (or "Foot-Long"). In the context in which applicant uses the term, it is clear that FOOTLONG denotes the fact that applicant purveys a type of sandwich that is approximately one foot long.

3.    Opposer's use of the term "Footlong."

The exhibit shown below displaying opposer's use of the term "Footlong" is Exhibit G to the Declaration of Valerie Pochron, an attorney of applicant, submitted

as part of applicant's opposition to opposer's motion for summary judgment.[24]



4.      Use of the term "Footlong" by third parties.

Opposer introduced numerous examples of third parties using the term "footlong" to identify sandwiches. Exhibits to the Metzger Declaration are copies of menus that reference sandwiches. The examples shown below are representative.

**BUONO'S NY STYLE PIZZA**
**PASTA SUBS CALZONES & MORE**
**480 792-1234**

HOME PAGE ┋ MENU ┋ REVIEWS ┋ ABOUT US ┋ LOCATION

**MENU**

\*      \*      \*

YES HERE ARE SOME MORE DELICIOUS CHOICES

HOT SUBS (FOOT LONG)
PEPPERONI MELT ........................6.99
MEATBALL ..................................6.99
MEATBALL PARMIGIANA .............7.99
SAUSAGE ....................................6.99
SAUSAGE PARMIGIANA ..............7.99
SAUSAGE PEPPERS ONIONS  7.99
PHILLY STEAK ............................7.99
CHICKEN PHILLY .......................7.99
CHICKEN  PARMIGIANA .............7.99
EGGPLANT PARMIGIANA ...........7.99
VEAL PARMIGIANA .....................8.99
EXTRA CHEESE ..........................1.00
EX PEPPERS ONIONS MUSH   .50

COLD SUBS (FOOT LONG)
HAM & CHEESE ..........................6.99
SALAMI & PROVOLONE ..............6.99
TURKEY .......................................6.99
PEPPERONI & PROVOLONE...6.99
CAPPICOLLA & PROVOLONE .6.99
ITALIAN MIX ...............................7.49
Cold subs made with
lettuce tomatoes and onions
choice of house dressing, mayo or mustard

---

[24] See also Tammy Dunkley Declaration, Exhibit 1.

**Native Seafood**

**Fresh Native Fish & Chips**
Reg. 8.25...Lg. 9.75

Calamari Platter...11.95

Foot-Long Clam Roll or Platter (whole bellies)...market price

Foot-Long Fried Scallops Roll or Platter...market price

Foot-Long Fried Oyster Roll or Platter...market price

Fresh Fish Sandwich...6.95

\*　　\*　　\*

Home   Menus   Photos   Our History   Links   Contact Us   Gift Certificates
The Yardarm: Eating and Drinking Pub Located on Route 28 in Orleans, Cape Cod Mass. Call for information: 508 255-4840
email: info@yardarmrestaurant.com



| **Chris' kitchen -** **An Eating** **Experience**<br><br>1602 N. Hercules Avenue<br>Clearwater, FL<br>(727) 446-3113<br><br>Hours:  8 a.m. - 3 p.m. Mon - Fri<br>**Free Local Delivery**<br>( minimum $10.00 order )<br><br>**Phone orders gladly accepted**<br>Call     (727) 446-3113 | **2 Locations** **to choose from** | **Chris' Kitchen** **is Expanding**<br><br>**13501 ICOT BLVD.  #100**<br>**Phone: 523-1332**<br>**Fax:      466-1664**<br><br>**Click! here for ICOT MENU**<br><br>( In the ICOT Plaza near Touson's)<br><br>We are the original<br>Chris' - not Affiliated<br>with any other restaurant |

\*　　\*　　\*

**Fresh Sliced Corned Beef**
or Pastrami...............Deli Rye **$5.29**   ................. Pressed Big Rye **$7.15**
Served with mustard and choice of cheese

(NEW)  FOOTLONG  COLOSSAL SUBS -  ..................................... $8.49
Ham, Salami, Turkey, Roast Beef, Bacon and Cheese with our and choice of
toppings.

(NEW) FOOTLONG COLOSSAL SUBS -  ..................................... $8.99
(served on French Roll)  Choice of 2 Meats and Cheese and choice of
toppings. Also available with: Tuna, Chicken or Egg Salad.





MENU

Pizza Party Specials · Lunch Specials · Appetizers · Garden Fresh Salads · Foot Long Hot Subs
Foot Long Cold Subs · Stromboli & Calzone · Spaghetti or Penne Pasta · Specialty Pastas
Home Baked Pastas · Baked Entrées · Chicken Entrées · Nizza Pizza Specials · Famous Stuffed Pizzas
Deep Dish Sicilian-Style Pizzas · NY Style Pizza by the Slice · Create Your Own Pizza
New York Style Cheesecakes · Cannolis · Drinks
Download our menu

\*     \*     \*

**Foot Long Hot Subs:**

| | |
|---|---|
| Meatball Parmigiana.......................... | $5.50 |
| Chicken Parmigiana.......................................................... | $5.50 |
| Eggplant Parmigiana.......................... | $5.50 |
| Sausage Parmigiana........................................................ | $5.50 |
| Sausage & Pepper............................................ | $5.50 |
| Philly Cheesesteak......................................................... | $6.50 |

**Foot Long Cold Subs:**

All Cold Subs are served with Lettuce Onions, Black Olives, Roasted Red Peppers & our Special House Dressing.

| | |
|---|---|
| Ham & Provolone...................................................... | $5.50 |
| Salami & Provolone...................................................... | $5.50 |
| Grilled Chicken....................................................... | $5.50 |
| Italian Combo........................................ Salami, | $6.50 |
| Ham, Pepperoni, & Provolone Cheese | |

Each of the above examples of third-party use of the term "footlong" (or "foot-long") demonstrates use of the term to denote a type of sandwich. None of the uses

27

appears to be intended to (and none of them does) function as an indicator of the source of the user's goods. Extensive use of the term by restaurants offering identical goods is strong evidence that purchasers will not be able to differentiate between competing sources by viewing the term "Footlong." Such use by competitors is evidence of genericness. *BellSouth Corp. v. DataNational Corp.,* 60 F.3d 1565, 35 USPQ2d 1554, 1558 (Fed. Cir. 1995); *Remington Products, Inc. v. North American Philips Corp.,* 892 F.2d 1576, 1578, 13 USPQ2d 1444, 1446 (Fed. Cir. 1990) (testimony of competitor's president of generic use by competitor).

Exhibit F to the Metzger Declaration consists of "printouts of webpages of reviews of restaurants and eateries that use the term 'footlong' or 'foot long' with sandwiches." The excerpts listed below are representative.

1.    The Happy Cow Compassionate Eating Guide (happycow.net)

Sheesha Café (Panama City, Florida)

Review: . . . My husband got the falafel baguette, which turned out to be a footlong sandwich for $6.99. . . .

\*    \*    \*

Basic 4 Vegetarian Snack Bar (Philadelphia, Pennsylvania)

Review: I ordered a Vegan Philly Cheese Steak and got a foot long sandwich with onions, "cheese", and "steak" that was greasy and delicious.

2.    Yelp.com

El Conejo Authentic Mexican Food (Santa Ana, California)

Great authentic Mexican food.

You really can't beat the $5 foot long burrito.

3. Superpages.com

Angelina's Italian Deli (East Greenwich, Rhode Island)

Description

Italian restaurant and deli serving authentic Italian food, foot-long subs, pasta, salads, wraps and catering.

Exhibit G to the Metzger Declaration consists of "printouts of articles located in the U.S. News database of Lexis-Nexis referencing the term 'footlong' with sandwiches including hot dogs for the years 2001 through 2010." The articles listed below reference sandwiches and not hot dogs and are representative.

1. *The New York Times* (January 23, 2010)

A Bittersweet Aftertaste for Jet Fans on Long Island

\* \* \*

"Vinny Testaverde - - pepper turkey on whole wheat, mustard on the side," he said. "Chad Pennington - - spinach omelets, four eggs. And like, oh my God, the defensive guys – the footlong hero we make, the Gladiator, with sausage, bacon, ham, cheese, anything you want. These guys could eat two of them."

2. *Pittsburgh Tribune Review* (November 18, 2009)

Anthony Jr.'s Restaurant & Pizzeria strives for good food, service

\* \* \*

Anthony Jr.'s favorites include the traditional hand-tossed pizza, with base prices ranging from $7.99 (four-cut junior) to $18.99 (16-cut jumbo). Hoagies – with half, 6-inch sandwiches costing $4.95 and whole, footlongs costing $7.95 to $8.95 – are also popular.

3. *Contra Costa Times* (April 30, 2009)

Giants ditch junk (mostly) for healthier buffet options

* * *

> … One former Giant, to everyone's amazement, routinely devoured a footlong cheese steak 10 minutes before batting practice.

In response to opposer's motion for summary judgment, applicant submitted the declaration of Alaine Doolan with news articles referencing applicant's sandwiches.

> 1. *Franchising.com* (April 9, 2009)
>
> $5 Footlong Subs Now At SUBWAY(R) Restaurants Across America
>
> All Day, Every Day – Any Regular Footlong Sub Sandwich for Only $5.00! …
>
> * * *
>
> This regular footlong sub value may also be applied to subs requested as part of a SUBWAY® combo meal …
>
> * * *
>
> Lower-priced SUBWAY® footlong subs will remain at their everyday low menu price.
>
> 2. *QSR Magazine* (QSR.com) (March 24, 2009)
>
> The $5 Phenomenon
>
> … The offer follows similar efforts by other chains such as Subway's $5 Footlong, Quiznos' $5 Deli Favorites, and Pizza Hut's (NYSE: YUM!) $5 Pizza Mia.
>
> 3. *Reuters* (reuters.com) (March 24, 2008)
>
> SUBWAY(R) Restaurant Chain Introduces $5 Footlongs
>
> A "Thank-you" to Customers for Making the Subway Footlong Famous

… With its new $5 footlong promotion, which begins today, SUBWAY(R) restaurants offers consumers its own take on an enticing economic package. …

\* \* \*

The offer gives customers up to a 25 percent discount off the famous footlong subs. According to Moody, the special offer is the chain's way of thanking customers for making SUBWAY® footlong sandwiches the number one globally. In the past 12 months SUBWAY(R) restaurants have sold enough footlong sandwiches to wrap around the globe almost 6 times.

With a wide array of great-tasting fresh ingredients to choose from and popular offerings like sweet onion chicken teriyaki, savory turkey breast and classic roast beef, one footlong SUBWAY(R) sandwich could be considered dinner for a single guy, a shared lunch for a mom and her kids, …

5. *Slate* (slate.com) (April 21, 2008)

AD REPORT CARD

Jingle Hell

The diabolical geniuses behind Subway's "five-dollar foot-long" song.

… Meanwhile, a song plays. The lyrics, repeated again and again: Five. Five dollar. Five dollar foot-long."

For a limited time, Subway is offering a special deal: foot-long subs for $5. Foot-longs were once Subway's "stock-in-trade," according to Chief Marketing Officer Tony Pace, …

\* \* \*

To ad agency MMB, the advent of a $5 foot-long seemed in itself momentous and compelling enough that elaborate persuasive efforts could only cloud the issue. …

6. *QSR Web* (qsrweb.com) (February 10, 2009)

Subway launches $5 foot long LTO

> Subway is launching a limited-time 5-foot-long sub promotion, the company has announced. All 20 of the chain's sandwiches will be available under the "five-dollar foot-long" deal.

The news articles applicant introduced do not reference "Footlong" as a trademark. In fact, the authors of the articles in *Franchising.com* and *Reuters* specifically identified SUBWAY as a trademark but did not identify "Footlong" as a trademark. To the contrary, the predominant use of "footlong" in these articles is as a term identifying a type of sandwich. As Judge Rich explained in *In re Abcor Development Corp.*, 588 F.2d 811, 816, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring) (emphasis in original), a term that immediately and unequivocally describes the purpose and function of appellant's goods is a name for those goods, for "[t]hat is what *names* do. They tell you what the thing is."

5.  Third-party use of Footlong in connection with hot dogs.

We disagree with applicant's contention that with respect to the use of the term "Footlong," "hot dogs are distinct from sandwiches in the mind of the consumer."[25] *See supra* Preliminary Issues Section A n.4. Although the description of goods has been amended to "sandwiches, excluding hot dogs," we are not persuaded that hot dogs are so distinct from other sandwiches that the use of the term "Footlong" in connection with hot dogs is irrelevant. In fact, dictionaries reference "footlong hot dogs" to help explain the meaning of the word "footlong." *See*

---

[25] Applicant's Brief, p. 19.

*supra* Section C(1).[26]   The evidence in this record indeed shows that the use of "Footlong" in connection with hot dogs is so pervasive that it affects how consumers perceive the term "Footlong" in connection with other types of sandwiches.

### 6.   Consumer Surveys

Each party proffered a "Teflon" survey to test how consumers perceive the term "Footlong."[27]  The surveys reach diametrically opposite results on the question of whether the term "Footlong" is generic, and each party has criticized the survey conducted by its opponent.[28]

Professor McCarthy describes a "Teflon" survey as a mini-course in the generic versus trademark distinction, followed by a test.   **MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION** § 12:16 (4th ed. 2013).

> In designing a TEFLON-type survey, both the initial "mini-test" and the other marks and generic names in the list must be carefully constructed and tailored to the facts of a particular case.

*Id.   See also Jacob Zimmerman v. National Association of Realtors,* 70 USPQ2d 1425, 1435-36 n.15 (TTAB 2004) (flaws in the design and administration of the survey, including the mini-test, resulted in the survey having limited probative value).

---

[26] Even if we did not consider the testimony and evidence regarding the use of "footlong" to describe or identify hot dogs, our decision would be the same.

[27] A "Teflon" survey refers to the format of the survey used in *E. I. du Pont de Nemours & Co. v. Yoshida International, Inc.,* 393 F. Supp. 502, 185 USPQ 597 (E.D.N.Y. 1975) to prove that "Teflon" was not generic.

[28] As mentioned earlier, we consider the Johnson survey only as evidence rebutting the Cogan survey, not to support opposer's case-in-chief as to genericness.

a.   Cogan survey conducted on behalf of applicant.

Dr. Sandra Cogan, the principal of Cogan Research Group, designed and conducted a "Teflon" type survey on behalf of applicant to prove that consumers perceive the term "Footlong" as a brand name rather than a common name. The survey was performed between May 19 and June 23, 2010, polling 200 interviewees in four geographic locations.

Dr. Cogan defined the universe of subjects likely to encounter the term "Footlong" as follows:

> … men and women 18 years old and older who had eaten at or had bought food or beverages to take out at fast food restaurants or sandwich shops in the past three months and ate at or took out food from these restaurants at least once a month.[29]

The survey was conducted in the following manner:

1.   The interviewer read aloud to survey respondents definitions of "common names" (generic names) and "brand names" and asked if respondents understood the definition of a common name and a brand name.

2.   The interviewer used the following examples to explain the difference between a brand name and a common name (emphasis in the original):

> *(EXAMPLE #1)* For example, the name "iced tea" is a common name for a type of beverage that is made by several companies. But "Snapple" is a brand name for iced tea that is made by one company.
>
> *(Example #2)* Another example is the name, "hamburger" which is the common name for a sandwich made with a cooked patty of ground meat placed in a bun.

---

[29] Genericness and Secondary Meaning Survey Regarding the Name "FOOTLONG," p. 11 (July 1, 2010) (Doolan Declaration, Exhibit A).

But "Quarter Pounder" is a brand name for a hamburger that is made by one company.

**(Example #3)** Another example is the name, "fried chicken" for chicken parts that have been breaded and fried, but "Original Recipe" is a brand name for a type of chicken made by one restaurant chain.[30]

3.    The mini-test was conducted by asking the respondent the following question: Do you understand what a common name is and what a brand name is?[31]

4.    Respondents who said they understood the difference between a common name and brand name were then read and shown a list of names individually for food and beverage products and asked whether they thought each name was a common name, a brand name, both, neither, or they didn't know.[32]

According to the Cogan survey, 54% of the respondents identified "Footlong" as a brand name, 34% identified it as a common name, and 9.5% identified it as both.[33] The complete survey results are set forth below.

Table # 1
Survey Results for "Brand Names"*
Sample Size = 200

| | NAMES | Common Name % | Brand Name % | Both % | Neither % | Don't Know % |
|---|---|---|---|---|---|---|
| a | BACONATOR | 7.0 | 77.0 | 1.5 | 2.0 | 12.5 |
| d | SLURPEE | 22.0 | 69.0 | 6.5 | .5 | 2.0 |
| f | GRAND SLAM | 14.5 | 80.5 | 2.5 | .5 | 2.0 |
| I | DIET COKE | 21.5 | 71.5 | 6.0 | 1.0 | 0.0 |
| k | DORITOS | 5.0 | 93.5 | 1.5 | 0.0 | 0.0 |
| m | GATORADE | 4.0 | 93.5 | 2.5 | 0.0 | 0.0 |
| g | FOOTLONG | 34.0 | 54.5 | 9.5 | 1.0 | 1.0 |

\* Percentage of survey respondents thinking each name is a "common name," a "brand name," "both," "neither," or "don't know."

---

[30] *Id.* at p. 13.

[31] *Id.*

[32] *Id.* at pp. 11 and 14.

[33] *Id.* at pp. 18-21.

Table # 2
Survey Results for "Common Names"*
Sample Size = 200

| | NAMES | Common Name % | Brand Name % | Both % | Neither % | Don't Know % |
|---|---|---|---|---|---|---|
| a | SOFT DRINK | 91.0 | 4.5 | 2.5 | 2.0 | 0.0 |
| c | SALAD | 93.0 | 1.5 | 2.5 | 1.5 | 1.5 |
| e | SIDE DISHES | 90.5 | 2.0 | 5.0 | 1.0 | 1.5 |
| h | SHAKES | 91.5 | 3.5 | 3.5 | 1.5 | 0.0 |
| j | ORANGE JUICE | 88.0 | 8.5 | 2.5 | 1.0 | 0.0 |
| l | BOTTLED WATER | 90.5 | 4.0 | 3.5 | 1.5 | .5 |
| g | **FOOTLONG** | **34.0** | **54.5** | **9.5** | **1.0** | **1.0** |

\* Percentage of survey respondents thinking each name is a "common name," a "brand name," "both," "neither," or "don't know."

There are several problems with the Cogan survey. First, the universe of respondents is too narrow. The description of goods in the application is "sandwiches, excluding hot dogs." As indicated above, the relevant public comprises ordinary consumers who purchase and eat sandwiches. Relevant consumers are not limited to recent and frequent patrons of fast food restaurants and sandwich shops; they include *inter alia* patrons of eat-in and sit-down restaurants, delicatessens, and supermarkets that sell sandwiches. Because the application does not limit the channels of trade or potential customers for applicant's sandwiches, we must presume that they are sold in all normal channels of trade and to all of the usual customers for such goods. *Octocom Sys. Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (*citing Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)). Accordingly, the survey results may be skewed because the survey did not include all of the potentially relevant consumers.

Second, the examples Dr. Cogan used to illustrate the difference between a common name and a brand name could be considered ambiguous, in a potentially significant way. By using highly descriptive terms that have acquired

distinctiveness, Dr. Cogan's "Quarter Pounder" and "Original Recipe" examples might have led consumers mistakenly to think that a heavily advertised word like "Footlong" has become the equivalent to the terms the interviewer used to explain the meaning of a brand name, rather than ensure that the survey respondents understood the difference between a common name and a brand name. After all, highly descriptive terms are only a hair's breadth away from generic terms, and the line between them is difficult to draw even for experienced trademark attorneys, let alone for the general sandwich-buying public. In other words, applicant's extensive advertising campaign may have created *de facto* secondary meaning (*i.e.,* buyer association with a generic term). *See Continental Airlines Inc. v. United Air Lines Inc.,* 53 USPQ2d 1385, 1395 (TTAB 2000) ("Even if one has achieved de facto acquired distinctiveness in a generic term through promotion and advertising, the generic term is still not entitled to protection because to allow protection would 'deprive competing manufacturers of the product of the right to call an article by its name.'"); *see generally In re Pennington Seed, Inc.,* 466 F.3d 1053, 1058-59, 80 USPQ2d 1758 (Fed. Cir. 2006).

Third, Dr. Cogan failed to conduct a mini-test to determine whether the respondents understood the difference between a common name and a brand name. Asking a respondent whether he or she understood the difference is not the same as *testing* whether she or he understood the difference.

> The gate-keeping questions in a genericness survey are designed to determine whether the survey participant understands the difference between "brand names" and "common names."

37

> In this flawed survey, rather than actually testing the survey participant's specific understanding of "whether Chevrolet is a brand name or a common name?" (the "Teflon" format), after providing some "training," the question was asked "Do you understand the difference between 'brand names' and 'common names?'" According to Dr. Jacoby, this is a leading question calling for a "yea-saying" response and is not a reliable measure of comprehension.

*See Jacob Zimmerman v. National Association of Realtors,* 70 USPQ2d at 1435-36 n.5.

Fourth, Dr. Cogan should not have provided respondents with the option of stating that the subject terms were both common names and brand names. By definition, a generic term for a product can never function as a trademark for that product. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 23 USPQ2d 1081, 1083 (1992) ("In contrast, generic marks [sic] – those that 'refe[r] to the genus of which the product is a species,' … are not registrable as trademarks."); *BellSouth Corp. v. DataNational Corp.,* 60 F.3d 1565, 35 USPQ2d 1554, 1557 (Fed. Cir. 1995) ("A generic term cannot be registered because such a term cannot function as an indication of source."); *In re Merrill Lynch, Pierce, Fenner, and Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987) ("Generic terms, by definition incapable of indicating sources, are the antithesis of trademarks, and can never attain trademark status."); **RESTATEMENT THIRD, UNFAIR COMPETITION** § 15, cmt. a (1995) ("Generic designations are not subject to appropriation as trademarks at common law and are ineligible for registration under state and federal trademark statutes."). A respondent who said that a term was both a brand name and a common name might not have understood the difference between the two. This

38

calls into question the validity of Dr. Cogan's results because we cannot be sure how many of the respondents actually understood the difference between a brand name and a common name.

In her analysis of Mr. Johnson's survey, Dr. Cogan criticized Mr. Johnson's failure to permit the respondents to answer "both," citing as authority *Windsurfing International, Inc. v. Fred Ostermann GmbH,* 613 F. Supp. 933, 227 USPQ 927, 946 n.168 (S.D.N.Y. 1985).[34] However, Dr. Cogan's reliance on *Windsurfing* is misplaced because in that case the court noted that although respondents were free to answer "both," "the answers of the persons who responded in this manner were not included in the final tabulation," whereas Dr. Cogan included responses identifying the names as both a brand name and a common name.

For these reasons, we give very little weight to applicant's Cogan survey on the question of whether prospective purchasers of sandwiches, excluding hot dogs, view the term "Footlong" as a common name or a brand name.

> b.    Johnson survey conducted on behalf of opposer.

Philip Johnson, the Chief Executive Officer of Leo J. Shapiro and Associates, Inc., a market research and consulting firm, testified that he designed and conducted a survey "that would address the major defects in the Cogan Survey and produce an accurate measurement of genericness."[35] The survey was performed between July 14 and July 26, 2011, polling 408 interviewees in eight geographic

---

[34] "Review of Philip Johnson's Genericness Survey," p. 17 (December 9, 2011) (Applicant's first notice of reliance).

[35] A Rebuttal of the Cogan Survey, p. 2 (Johnson Declaration (October 11, 2011), Exhibit A).

locations.[36]  As noted earlier, we have considered this survey not as evidence of genericness supporting opposer's case in chief, but only to the extent it stands as evidence rebutting applicant's case-in-chief.

Mr. Johnson interviewed adults over the age of 18 "who have purchased food to take out, for delivery, or to eat at a cafeteria, sandwich shop, deli, coffee shop, or restaurant in the past month."[37]  Mr. Johnson has acknowledged that his survey universe is narrow, "[b]ecause it's a rebuttal survey."[38]

> Q. And why would you narrow the universe because it's a rebuttal survey?
>
> A. Because if I used a broader universe I would still have to identify the universe that's comparable to the universe that Cogan used, because it's a rebuttal survey where you can't compare the results directly. So I removed the bias from the question that she used, in other words, by the focus on fast food restaurant which was the bias, out of the definition, it was consistent with what she did, but it was correcting for the bias. But it is somewhat narrower than the broadest possible universe.[39]
>
> *      *      *
>
> Q. Now, you've also identified what you would use as the correct universe; is that correct?
>
> A. Well, I identified the universe of genericness if you included people who would make it at home rather than just those who purchase it out, yes, that is correct.

---

[36] *Id.* at p. 4.

[37] *Id.* at p. 5

[38] Johnson Dep. (November 29, 2011), p. 9.

[39] *Id.* at 10.

Q.    … why didn't you use that original universe you defined in September of 2010 in your report? Assuming that's the correct one, and why did you only go halfway?

\*      \*      \*

A.    Well, first, it isn't halfway, as you, I think you asked me in my deposition prior, doesn't it include about 90 percent of the population to have people who eat out in the past month to which the answer is, yes, it includes 80 to 90 percent of the population. So leaving out the 10 percent as a small group of people who aren't going to be reported on their own. But to make things comparable, in other words, apples to apples comparability I thought the correct thing to do was to take out the fast food bias, in other words, the word fast food but leave the definition that it's people who eat out in the past month.[40]

While the Johnson survey universe is narrow, it is broader than the Cogan survey universe.[41]

The survey was conducted in the following manner:

Step 1. The interviewer read the following introduction to the prospective respondents (emphasis in the original):

As you may know, most products and services have two names. One tells us what <u>type</u> of product or service it is, such as CREDIT CARD, AUTOMOBILE, or HAMBURGER, which are names used to identify different products or services that come from many different sources or companies. The other is its <u>brand</u> name, such as VISA, TOYOTA, or DENNY'S, which is used to identify a particular product or service that comes from a particular source or company. Before we go on, do you understand what I mean when I talk about a <u>type</u> of

---

[40] *Id.* at 11-12.

[41] Based on the description of goods, the proper survey universe should include all people who purchase and eat sandwiches (defined to exclude only hot dogs).

product or service or a <u>brand</u> name, or would you like me to read the examples again?[42]

Step 2.    The respondent had to report that he/she understood, otherwise the interview was terminated.[43]

Step 3.    If the respondent said that he/she understood the difference between and type of product and a brand name, they were asked the following mini-test questions in rotated order (emphasis in the original):

> Let's take some example terms that are used in the food service industry.
>
> <u>Question VIII</u>:
>
> **HAND RESPONDENT "CORNDOG" CARD AND SAY**:  Do you believe that the word on the card is a … (**ROTATE ORDER OF FIRST TWO ALTERNATIVES READ**)?
>
> … TYPE?
>
> > <u>OR</u>
>
> …BRAND?
>
> > <u>OR</u>
>
> … DO YOU NOT KNOW?
>
> *    *    *
>
> **HAND RESPONDENT "DORITOS" CARD AND SAY**: Do you believe that the word on the card is a … (**ROTATE ORDER OF FIRST TWO ALTERNATIVES READ**)?
>
> … TYPE?
>
> > <u>OR</u>

---

[42] A Rebuttal of the Cogan Survey, p. 7 (Johnson Declaration (October 11, 2011), Exhibit A).

[43] *Id.*

…BRAND?

OR

… DO YOU NOT KNOW?[44]

Step 4. If the respondent answered either question incorrectly or answered "did not know" to either one, the interview was terminated.[45]

Step 5. The successful respondents were then shown a card with terms used for products or services in the food industry and asked whether the terms were (i) a type of product or service, (ii) a brand of product or service, (iii) have you never heard of it, or (iv) do you not know.[46]

According to the Johnson survey, 80% of the respondents identified "Footlong" as a type of product, 19% identified it as a brand, and 1% did not know.[47] The complete survey results are set forth below.[48]

| | MILKSHAKE (408) 100% | PANCAKE (408) 100% | GRILLEDCHEESE (408) 100% | COLESLAW (408) 100% | FOOTLONG (408) 100% |
|---|---|---|---|---|---|
| **ALL RESPONDENTS** | | | | | |
| Type | 97% | 97% | 97% | 96% | 80% |
| Brand | 2 | 3 | 3 | 3 | 19 |
| Never Heard Of | -- | -- | -- | * | -- |
| Don't Know | 1 | * | * | * | 1 |

---

[44] *Id.* at pp. 8-9.

[45] *Id.* at p. 9.

[46] *Id.* at pp. 10-11.

[47] *Id.* at pp. 13-15.

[48] The tables may not add up to 100% due to rounding. The asterisk means 0.5% or fewer mentions, but not zero. *Id.* at 14.

| ALL RESPONDENTS | GATORADE (408) 100% | COCACOLA (408) 100% | MCMUFFIN (408) 100% | WHOPPER (408) 100% | *FOOTLONG (408) 100%* |
|---|---|---|---|---|---|
| Brand | 97% | 97% | 59% | 57% | *19%* |
| Type | 2 | 3 | 41 | 42 | *80* |
| Never Heard Of | -- | -- | -- | * | -- |
| Don't Know | * | * | * | * | *1* |

The Johnson survey did not suffer from the same defects found in the Cogan survey and is a probative indicator of consumer perception. On the other hand, Dr. Cogan reported that Mr. Johnson's survey suffers from "overall and systematic bias introduced in his survey by the wording and terminology used throughout his questionnaire."[49]

With respect to the universe of survey respondents, Dr. Cogan criticized the following qualifying question used by Mr. Johnson:

> Thinking about the past month, have you purchased any food to take out, for delivery, or to eat in a cafeteria, sandwich shop, deli, coffee shop or restaurant?

Dr. Cogan asserts that the question is "oddly and awkwardly worded and difficult for a survey respondent to follow" and "the respondent is unlikely to take away any idea of what sort of product or eating establishment is relevant to what sort of product he or she is going to be asked about." Furthermore, she contends that Mr. Johnson did not include fast food restaurants.[50]

We disagree that Mr. Johnson excluded fast food restaurants. The word "restaurant" is not limited to any specific restaurant and we see no reason why consumers would not understand the term to include fast food restaurants.

---

[49] "Review of Philip Johnson's Genericness Survey," p. 6 (December 9, 2011) (Applicant's first notice of reliance).

[50] *Id.* at 9.

Moreover, the use of the word restaurant in proximity to take out food, coffee shops, sandwich shops and delis calls to mind fast food restaurants rather than excluding them.

Second, Mr. Johnson conducted a "double-blind" survey approach "where neither the respondents nor the interviewers conducting the study were aware of the purpose of the research or the identity of the party who commissioned it."[51] The "double-blind" approach minimizes bias because neither the interviewers nor the respondents know the purpose of the survey. There is no reason for a respondent "to take away any idea of what sort of product or eating establishment is relevant to" the subject matter of the survey.

Third, Dr. Cogan is highly critical of Mr. Johnson's explanation differentiating brand names from common names.[52] However, Mr. Johnson's survey results demonstrate that the respondents had a firm understanding regarding the difference between a common name and a brand name (*e.g.,* only 3% of the respondents in the Johnson survey identified COCA-COLA as a common name whereas 21% of the respondents in the Cogan survey identified DIET COKE as a common name and 6% of the respondents identified it as both a common name and a brand name).

Dr. Cogan criticizes the examples that Mr. Johnson used to explain the difference between a common name and a brand name (*i.e.,* credit card/VISA, automobile/TOYOTA and hamburger/DENNY'S). According to Dr. Cogan, because

---

[51] A Rebuttal of the Cogan Survey, p. 11.

[52] *Id.* at pp. 9 – 15.

the word "visa" may be a travel document, because TOYOTA manufactures many products, and because DENNY'S is a restaurant (i.e., a service provider) and not a product, consumers would be confused.[53] We disagree. When used in the context of the explanation in Mr. Johnson's survey, set forth above, VISA would be understood to mean a credit card brand and not a travel document, and TOYOTA would be understood as a brand for automobiles. While the hamburger/DENNY'S example was less than ideal, we think in the context of the other two examples survey respondents would understand DENNY'S as the brand of a restaurant that serves food referred to as hamburgers.

Fourth, Dr. Cogan criticizes Mr. Johnson's use of the term "food service industry" to introduce his mini-test, arguing that Mr. Johnson is "confusing to the survey respondents" because the term misleads the respondents into thinking the questions relate to food and beverages purchased at fast food restaurants or sandwich shops.[54] As indicated above, the results of the Johnson survey show that the respondents understood the difference between a brand name and a common name and, therefore, the respondents were not confused. Moreover, suggesting the sector or industry in which the terms and marks were used is not a fatal flaw because trademarks are understood in relation to goods and services, not in the abstract.

Fifth, Dr. Cogan also criticizes Mr. Johnson's use of the term "type of product or service" to define a generic or common name because it "immediately tells survey

---

[53] "Review of Philip Johnson's Genericness Survey," p. 11.

[54] *Id.* at pp. 12-13.

respondents that a 'descriptive name' can be a type of product or service."[55]  Dr. Cogan supports this argument by pointing to the survey results where 41% of the respondents identified McMUFFIN as a type of product and 42% of the respondents identified WHOPPER as a type of product.  After carefully reviewing Mr. Johnson's instructions and examples, we find nothing therein would lead a respondent into believing that a descriptive name is a type of product.  In fact, Mr. Johnson's choice of brand names avoided descriptive terms and the majority of respondents properly classified McMUFFIN and WHOPPER as brand names.

Sixth, Dr. Cogan criticizes Mr. Johnson's use of CORNDOG in the mini-test and GRILLEDCHEESE in the survey because CORNDOG and GRILLEDCHEESE are actually two words – "Corn Dog" and "Grilled Cheese" – and by displaying them as one word Mr. Johnson "signals survey respondents that a descriptive/suggestive name 'FOOTLONG' should be classified as a 'type of product.'  This is leading the survey respondent to the answer preferred by the Johnson Rebuttal Survey."[56]  The display of "Corn Dog" and "Grilled Cheese" as one word instead of two words is not a fatal error.  First, it is not clear that most respondents recognized that CORNDOG and GRILLEDCHEESE were actually two words instead of one word and, to the extent that they did, it is doubtful that the respondents cared or that it affected their response.  Moreover, since GRILLEDCHEESE was presented as one of several terms created by merging two words (*i.e.,* MILKSHAKE and PANCAKE), we are not persuaded that the respondents were led to classify FOOTLONG as type of product

---

[55] *Id.* at pp. 13-15.

[56] *Id.* at pp. 15-16.

simply because "grilled cheese" and "corn dog" were depicted without a space. Finally, we note that applicant, itself, uses "Foot Long" and "Footlong" interchangeably. *See supra* Section C.2. "Applicant's Use of 'Footlong."

Seventh and last, Dr. Cogan criticized Mr. Johnson for using COCACOLA [sic] and GATORADE as brand names in his survey because they are well known, if not famous, brands and they are not descriptive or suggestive.[57] We see nothing wrong with Mr. Johnson's use of COCA-COLA and GATORADE because they act as control terms demonstrating that the respondents understand the difference between common names and brand names. Furthermore, as indicated above, the results show that 59% of the survey respondents correctly identified McMUFFIN as a brand name and that 57% of the respondents correctly identified WHOPPER as a brand name; both terms are at least somewhat suggestive.

In summary, we find that the Johnson survey supports our finding that the Cogan survey is entitled to little probative value. However, we do not rely on it in determining the ultimate question of whether opposer has proved the term "footlong" to be generic.

## Discussion

Based on the record evidence properly before us, we find that "Footlong," as used by applicant, identifies a type or category of sandwich and that the relevant public understands the term "Footlong" to refer to that class of products that includes 12-inch sandwiches. The commonly understood meaning of "Footlong,"

---

[57] *Id.* at pp. 16-17.

applicant's own use of the term, opposer's use of the term and third-party uses demonstrate that purchasers understand that "Footlong" identifies 12-inch sandwiches. We accordingly find that FOOTLONG is generic for "sandwiches, excluding hot dogs."

In making the determination that the term "Footlong" is generic, we readily acknowledge that "Footlong" is not the name of a food product; rather, it is an adjective referring to the length of the sandwich. This adjectival use, however, does not remove "Footlong" from being generic when used in connection with sandwiches. *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,* 561 F.2d 75, 195 USPQ 281, 285 (7th Cir. 1977) ("The fact that 'light' is an adjective does not preclude it from being a generic or common descriptive word" as applied to beer). Although it has sometimes been said that "generic names are nouns and descriptive names are adjectives," such a rule is not consistent with the Board's precedent or that of many courts; genericness cannot be determined simply by applying prescriptivist rules based on parts of speech. **MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION** § 12:10 (4th ed. rev. March 2013).

In this case, the record makes clear that "footlong" has and continues to be widely used in the food and restaurant industry to refer primarily to 12-inch sandwiches. The term does not merely describe a sandwich, but in fact identifies a category of sandwiches included within the relevant genus. And because "Footlong" identifies a category of sandwiches 12 inches long, it should be freely available for use by competitors. *See In re Northland Aluminum Products, Inc.,* 777 F.2d 1556,

49

227 USPQ 961 (Fed. Cir. 1985) (BUNDT for coffee cake); *In re Sun Oil Co.,* 426 F.2d 401, 165 USPQ 718 (CCPA 1970) (CUSTOMBLENDED for gasoline held generic because category of gasoline was blended personally for motorist); *In re Helena Rubenstein, Inc.,* 410 F.2d 438, 161 USPQ 606 (CCPA 1969) (PASTEURIZED for face cream held generic); *In re Preformed Line Products Co.,* 323 F.2d 1007, 139 USPQ 271 (CCPA 1963) (PREFORMED for preformed electrical equipment held generic); *Servo Corp. of America v. Servo-Tek Products Co.,* 289 F.2d 437, 126 USPQ 362 (CCPA 1960) (MATCHBOX for toy vehicles held generic because that category of toy cars was sold in matchbox-sized boxes).

Applicant contends that "Footlong" is not generic because dictionaries do not define "Footlong" as a sandwich.[58]  However, the record shows that "Footlong' has a well-understood and recognized meaning as a sandwich that is 12 inches long; the fact that dictionaries do not define "Footlong" as a sandwich is not controlling on the question of registrability.  *See In re Gould Paper Corp.,* 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987) (SCREENWIPE held generic even though there was no dictionary definition of the compound term); *In re Dairimetics, Ltd.,* 169 USPQ 572, 573 (TTAB 1971) (ROSE MILK refused registration on the Supplemental Register even though there was no dictionary definition of ROSE MILK).

Finally, applicant argues that opposer's evidence of third-party use is not persuasive because of "the small, local nature of operations and their geographic

---

[58] Applicant's Brief, p. 32.

obscurity and disparity."[59]  We disagree.  The various third-party uses demonstrate that competitors use the term "footlong" to refer to their 12-inch sandwiches and that consumers have become conditioned to recognize that many entities refer to 12-inch sandwiches as a "footlong."  This is a different conclusion from that reached by the Board in *Carl Karcher Enterprises Inc. v. Stars Restaurants Corp.,* 35 USPQ2d 1125, 1131 (TTAB 1995) relied on by applicant.  However, *Carl Karcher Enterprises* is a likelihood of confusion case in which the Board noted that stars were a common shape and were laudatory when used in connection with restaurant services.  Nevertheless, the Board found that opposer's marks were strong, even in the face of third-party uses, because such uses were obscure.  In this case, where we are determining whether "Footlong" is generic, the evidence shows it is common to use the term "Footlong" to refer to 12-inch sandwiches.  The fact that applicant's business is much larger than some other establishments using "Footlong" in connection with 12-inch sandwiches does not establish applicant's right to exclusive use of the term.  The Trademark Act protects all competitors, big or small, against harm resulting from registration of generic terms.

We find that "footlong" is a generic term for "sandwiches, excluding hot dogs," and therefore the opposition is sustained on this ground.

<u>Acquired Distinctiveness</u>

For purposes of completeness, we address the issue of whether the term "Footlong" when used in connection with sandwiches, excluding hot dogs, has

---

[59] Applicant's Brief, p. 34.

acquired distinctiveness. This scenario presupposes that the Board's decision is appealed and the reviewing court finds that the term "Footlong" used in connection with sandwiches, excluding hot dogs, is not generic. For purposes of this discussion, we treat applicant's mark as highly descriptive but not generic.

During the prosecution of the application, applicant argued that "Footlong" had acquired distinctiveness as a source indicator and amended the application to seek registration under the provisions of Section 2(f) of the Trademark Act. Accordingly, opposer has the initial burden of showing that applicant's mark has not acquired distinctiveness. *Yamaha International v. Hoshino Gakki*, 840 F.2d 1572, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988) (a party challenging the sufficiency of an applicant's § 2(f) showing "must have at least the initial burden of challenging or rebutting the applicant's evidence of acquired distinctiveness made of record during prosecution which led to publication of the proposed mark.").

> An opposer to an application submitted under Section 2(f) sufficiently meets its initial burden if it produces sufficient evidence or argument whereby, on the entire record then before the board, the board could conclude that the applicant has not met its ultimate burden of showing acquired distinctiveness. *Cf. Sanyo Watch Co. v. Sanyo Electric Co.*, 691 F.2d 1019, 1022, 215 USPQ 833, 834 (Fed. Cir. 1982) (opposer's prima facie case requires "facts from which the board might reasonably conclude" that applicant was not entitled to the registration sought). Thus, the board's requirement that Yamaha establish a prima facie case of no acquired distinctiveness does not require Yamaha to "prove" anything, but simply requires Yamaha to present sufficient evidence or argument on which the board could reasonably conclude that Hoshino had not proven at least one of the elements necessary to obtain a trademark registration.

*Yamaha International v. Hoshino Gakki*, 6 USPQ2d at 1004. Opposer has met its initial burden based on the record before us as discussed in the genericness section of this opinion. Thus, if the term should be determined not to be generic, because the evidence shows that the mark is, at the very least, highly descriptive, it is more than sufficient for us to "reasonably conclude" that the term has not acquired distinctiveness.

When, as here, the opposer has met its initial burden challenging the sufficiency of applicant's proof of acquired distinctiveness, applicant may then present additional evidence and argument to rebut opposer's showing and to establish that its mark has acquired distinctiveness. *Yamaha International v. Hoshino Gakki*, 6 USPQ2d at 1005. However, the main focus of the Board at this point of the proceeding, where both parties have presented their evidence, filed briefs and appeared at an oral hearing, is to determine which party should prevail on the entire record. *Yamaha International v. Hoshino Gakki*, 6 USPQ2d 1006. In this regard, the ultimate burden of persuasion on the issue of acquired distinctiveness is on applicant. *Yamaha International v. Hoshino Gakki*, 6 USPQ2d 1006.

To prove that its mark has acquired distinctiveness under Section 2(f) of the Trademark Act, an applicant may submit any "appropriate evidence tending to show the mark distinguishes [applicant's] goods." *Yamaha International v. Hoshino Gakki*, 6 USPQ2d at 1010, *quoting* Trademark Rule 2.41(a), 37 CFR 2.41(a). Such evidence includes the duration, extent and nature of the use of the mark in

commerce, advertising expenditures, letters or statements from the trade or public, and other appropriate evidence. Trademark Rule 2.41(a). *See also In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005) (acquired distinctiveness may be shown by copying, unsolicited media coverage and consumer surveys). "The amount and character of the evidence, if any, required to establish that a given word or phrase … 'has become distinctive' of the goods necessarily depends on the facts of each case and the nature of the alleged mark." *Roux Laboratories, Inc. v. Clairol Inc.*, 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970). *See also In re Steelbuilding.com*, 75 USPQ2d at 1424 ("no single factor is determinative … the determination examines all of the circumstances involving the use of the mark"). With respect to the nature of the alleged mark, "the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *In re Steelbuilding.com*, 75 USPQ2d at 1424. Because "Footlong" when used in connection with sandwiches is highly descriptive, applicant has a heavy burden of showing acquired distinctiveness.

Applicant argues that by its use of "Footlong" in connection with sandwiches, the term has acquired distinctiveness through its extensive sales and advertising, as evidenced by opposer's copying of applicant's mark, unsolicited media coverage, and Dr. Cogan's survey.[60]

---

[60] Applicant's Brief, pp. 26-30.

A.    Applicant's sales and advertising of "Footlong."

Applicant started using the term FOOTLONG on custom sandwiches at least as early as 1967.[61]  From 2000 to 2009, applicant sold over four billion sandwiches "under the FOOTLONG trademark."[62]  In 2008, applicant launched a "$5 FOOTLONG" marketing campaign which nearly doubled applicant's annual sales of "Footlong" sandwiches from $541 million to $936 million per year.[63]  While applicant has achieved great commercial success, sales success is not necessarily indicative of acquired distinctiveness, but may be attributed to many other factors, the most likely being that applicant offers a quality product at a competitive price. *See Cicena, Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 14 USPQ2d 1401, 1406 (Fed. Cir. 1990).  *See also In re Boston Beer Co. L.P.,* 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) (claim based on annual sales under the mark of approximately eighty-five million dollars, and annual advertising expenditures in excess of ten million dollars, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of mark); *In re Ennco Display Systems Inc.,* 56 USPQ2d 1279, 1285 (TTAB 2000) (applicant's sales, while impressive, may only demonstrate the growing popularity of the product, not consumer recognition of the trademark).

Further, as noted above, applicant uses the term "Footlong" to refer to its 12-inch sandwiches, just as it uses "6-inch" to refer to sandwiches half as long.

[61] Pochron Declaration ¶ 10.

[62] Pochron Declaration ¶ 11.

[63] Pochron Declaration ¶¶ 11, 17; Exhibit C (the Pochron Affidavit Claiming § 2(f) in support of the application at issue).

Because of the way applicant uses the term "Footlong" on menus and advertising, consumers are much more likely to view it as referring to sandwiches of a particular size, not as a trademark. Therefore, applicant's sales do not represent public recognition of "Footlong" as a trademark.

B.    <u>Whether opposer's $4 FOOTLONG advertising campaign is evidence that opposer has copied applicant's FOOTLONG mark</u>?

Opposer launched a $4 FOOTLONG marketing campaign from November 2008 to March 2009.[64]   Comparative advertisements of the parties are set forth below.

<u>Applicant's Advertisement</u>                <u>Opposer's Advertisement</u>

     

Opposer did not copy applicant's "Footlong" mark; rather, opposer copied the idea behind applicant's $5 Footlong promotion and undercut applicant's price.  In this regard, we note that opposer's name [SHEETZ] appears prominently on its poster, thus demonstrating that opposer's intent was not to trade upon applicant's goodwill or trademark but to exploit a successful marketing scheme. *See Cicena, Ltd. v. Columbia Telecommunications Group,* 14 USPQ2d at 1406 (where product design has intrinsic consumer-desirability as evidenced by sales success, a

---

[64] Pochron Declaration ¶ 17; Dunkley Declaration ¶ 11.

competitor's sale of a like product "was more likely based on an effort to capitalize on that intrinsic consumer desirability than on any alleged secondary meaning."); *Duramax Marine, LLC v. Fernstrum & Co.*, 80 USPQ2d 1780, 1798 (TTAB 2006) (to be relevant, copying needs to be for the purpose of confusing consumers as to source or to trade on another's goodwill).

Although opposer used the term "Footlong" long after applicant's first use, the rights of others to use descriptive or generic terms in competition is the purpose of Trademark Act § 2(e)(1), at least in part. "Competitors unable to use a common term that describes or designates their product are at a significant disadvantage communicating to potential customers the nature and characteristics of the product." *Boston Duck Tours LP v. Super Duck Tours LLC*, 531 F.3d 1, 87 USPQ2d 1385, 1392 (1st Cir. 2008) (citations omitted). Having adopted a descriptive term, applicant should not be surprised to find that many others -- opposer, as well as a number of third parties -- also use the term. Even if applicant was the first and/or sole user of a generic term or phrase, as it claims, that does not entitle applicant to register such a term or phrase as a mark. *See KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc.*, 543 U.S. 111, 122, 72 USPQ2d 1833, 1838 (2004) ("allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first" would "deprive commercial speakers of the ordinary utility of descriptive words"); *In re National Shooting Sports Foundation, Inc.*, 219 USPQ 1018, 1020 (TTAB 1983). Moreover, while other terms may be used to identify applicant's type of product, it is well settled that there can be more than one term to

name a product. *Roselux Chemical Co., Inc. v. Parsons Ammonia Co., Inc.*, 299 F.2d 855, 132 USPQ 627, 632 (CCPA 1962). *See also*: *In re Sun Oil Co.*, 426 F.2d 401, 165 USPQ 718, 719 (CCPA 1970) (Rich, J., concurring) ("*All* of the generic names for a product belong in the public domain.") (emphasis in original). Under these circumstances, we do not find that opposer's use or use by others to be "copying" sufficient to prove that "Footlong" has acquired distinctiveness.

C.     Unsolicited media coverage of applicant's use of "Footlong."

Applicant argues that it "has received unsolicited media coverage of its FOOTLONG brand sandwiches supporting the conclusion that the FOOTLONG mark has acquired distinctiveness."[65] Representative examples of the unsolicited media coverage are set forth in the analysis of whether the term is generic in Section C(4) *supra*. The media coverage does not demonstrate that the term "Footlong" has acquired distinctiveness because the news articles use the term "Footlong" generically, not as a trademark, and they focus primarily on the $5 footlong promotion rather than the alleged FOOTLONG mark.

D.     Whether applicant's use of FOOTLONG has been substantially exclusive?

Applicant asserts that it is the only "quick service restaurant" that uses or has used "Footlong" for sandwiches.[66] This claim is simply not supported by the

---

[65] Applicant's Brief, pp. 28-29.

[66] Applicant's Brief, p. 29. Whether applicant is the only "quick service" restaurant to use "Footlong" is irrelevant. As noted above, applicant's goods are not limited to those sold in any particular type of store or restaurant. For purposes of registration, we must consider the descriptiveness or genericness of the term as it is used in any channel of trade that is normal for "sandwiches, excluding hot dogs," regardless of applicant's actual channels of trade. *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (*citing Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)).

record. The third-party use of the term "Footlong" is extensive. *See supra* the discussion of third-party use in the analysis of whether the term is generic in Section C(4). In this case, the widespread use of "Footlong" demonstrated by this record would itself be sufficient to dispose of applicant's claim of acquired distinctiveness:

> In respect of registration, there must be a trademark, i.e., purchasers in the marketplace must be able to recognize that a term or device has or has acquired such distinctiveness that it may be relied on as indicating one source of quality control and thus one quality standard. When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, an application for registration under Section 2(f) cannot be successful, for distinctiveness on which purchasers may rely is lacking under such circumstances.

*Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939, 941 (Fed. Cir. 1984).

Applicant further contends that it polices the use of "Footlong" and that in the past six years it "has made at least thirty written demands to third parties to cease and desist unauthorized use of the FOOTLONG mark for sandwiches."[67] However, acquiescence to demands of competitors to cease use of a term can be equally viewed as simply a desire to avoid litigation. *See, e.g., In re Wella Corp.*, 565 F.2d 143, 144 n.2, 196 USPQ 7, 8 n.2 (C.C.P.A. 1977); *In re Consol. Cigar Corp.*,

---

[67] Applicant's Brief, p. 17.

13 USPQ2d 1481, 1483 (TTAB 1989). This is especially true in this case, where applicant is the largest fast food restaurant chain in the country.[68]

E.  The probative value of Dr. Cogan's survey.

Dr. Cogan also measured "the extent to which the name FOOTLONG is associated with a single source and if so, has attained 'secondary meaning' in the marketplace."[69]

> The 109 respondents who thought the name FOOTLONG was a brand name, were further asked Question 3: "What type of product or service do you think FOOTLONG is a brand name for?" A total of 98 respondents (49% of the total sample of 200) mentioned "Subway" and no other restaurant name in their answers.
>
> The 19 respondents who thought FOOTLONG was both a brand name and a common name were asked Question 4a: "You thought FOOTLONG is both a common name and a brand name. Why do you think "FOOTLONG" is both a common name and a brand name? and Question 4b: "What type of product or service do you think FOOTLONG is a brand name or common name for?" A total of 8 respondents mentioned "Subway" and no other restaurant in their answers.[70]

The problems that we previously identified in Dr. Cogan's survey affect the probative value of the survey as applied to measuring acquired distinctiveness. For example, Dr. Cogan's universe is too narrow. There may be an overreliance on patrons of "fast food" establishments that skews the results because the proper universe is all consumers who purchase and eat sandwiches. In addition, because

---

[68] Wilker Declaration ¶¶ 3 and 6. *See also* Applicant's Brief, p. 10.

[69] Genericness and Secondary Meaning Survey Regarding the Name "FOOTLONG," p. 20 (July 1, 2010) (Doolan Declaration, Exhibit A).

[70] *Id.* at p. 21. The Cogan report does not segregate the responses to 4(a) and 4(b).

Dr. Cogan did not conduct a mini-test, we have little confidence that the respondents understood the difference between a common name and brand name and, therefore, we cannot be sure what percentage of the respondents are associating a common name with a single source. Finally, Dr. Cogan's question, "What type of product or service do you think FOOTLONG is a brand name for?", is leading, because it asks the respondent to identify the company he/she associates with the brand FOOTLONG. The proper question is do you associate the term "Footlong" with one company, more than one company, or no company? An appropriate follow-up question would be what company or companies do you associate with "Footlong."

Based on a consideration of all the evidence in the record, we find that applicant has failed to establish that "Footlong" has acquired distinctiveness.

**Decision**: The opposition is sustained on the ground that "Footlong" used in connection with sandwiches, excluding hot dogs, is generic. In the event that applicant's proposed mark should be found not to be generic in any appeal of this decision, we further find that the mark has not acquired distinctiveness and is not entitled to registration under Section 2(f).